[Cite as *State v. Allen*, 2012-Ohio-1831.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 97014**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DEMETRIUS ALLEN

DEFENDANT-APPELLANT

**JUDGMENT:**
**AFFIRMED**

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-540250

**BEFORE:** Blackmon, A.J., S. Gallagher, J., and Kilbane, J.

**RELEASED AND JOURNALIZED:** April 26, 2012

-i-

**ATTORNEY FOR APPELLANT**

Joseph Vincent Pagano
P.O. Box 16869
Rocky River, Ohio 44116

**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor

Sanjeev Bhasker
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

PATRICIA ANN BLACKMON, A.J.:

{¶1} Appellant Demetrius Allen appeals his convictions and sentence. Allen assigns the following errors for our review:[1]

**I. Appellant's convictions are against the manifest weight of the evidence.**

**II. The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.**

**III. Appellant was deprived of his due process rights and his rights to a fair trial by jury under the Sixth Amendment of the U.S. Constitution where issues of sleeping jurors were not timely addressed.**

**IV. Suggestions of potential gang affiliation and improper comments about defense counsel resulted in prejudice and deprived appellant of his federal and state constitutional rights to due process and a fair trial.**

**V. Defendant was denied his right of confrontation and cross-examination when the court permitted hearsay information.**

**VI. The trial court erred by imposing separate sentences for allied offenses of similar import.**

{¶2} Having reviewed the record and pertinent law, we affirm Allen's convictions. The apposite facts follow.

{¶3} In the early evening of July 17, 2010, five men were socializing in front of a house located near the intersection of East 123rd Street and Signet Avenue in Cleveland, Ohio. At approximately 8:30 PM, two men approached, one armed with an assault rifle,

---

[1]This appeal is a companion case arising out of the same events as contained in *State v. Logan*, 8th Dist. No. 97022.

and unleashed a barrage of gunfire on the assembled men. At the end of the onslaught, two men, Miley Slaughter and Kenneth Green, were dead. Two others, Timothy Sisson and Antwon Weems, were wounded, and a fifth man, Willie Tyson, escaped unharmed.

{¶4} As a result of the attack, on August 4, 2010, a Cuyahoga County Grand Jury indicted Demetrius Allen and Montez Logan, with two counts of aggravated murder and three counts of attempted aggravated murder. Each count had course of conduct, as well as one and three-year firearm specifications attached. The grand jury also indicted Allen and Logan with two counts of having weapons while under disability.

{¶5} On August 9, 2010, Allen and Logan pleaded not guilty at the arraignment. Thereafter, numerous pretrials were conducted. On May 23, 2011, a joint jury trial commenced.

### Jury Trial

{¶6} At trial, the state presented the testimony of 22 witnesses, including Eric Brown testified that on the evening of July 17, 2010, after playing cards on his front porch, went inside to sit in his living room. Brown later looked through his bay window and saw Slaughter, Green, Sisson, Weems, and Tyson socializing in front of his house.

{¶7} Brown testified that he heard gunfire a short time later and looked through the window and saw Allen discharging a military-style automatic gun at the men assembled, who attempted to flee. Two of the men ran up the driveway and others ran down the sidewalk. While continuing to shoot, Allen ran across Brown's front lawn,

Slaughter fell in the driveway, and Allen stood over him and stated: "I got your bitch ass." Brown testified that throughout the rampage, Logan was standing close to Allen and was very hyped up, but did not have a weapon.

{¶8} Brown he immediately closed the curtains to the bay window after witnessing the shootings, and was somewhat surprised that Allen had not seen him watching. After the assailants fled, Brown exited his house and found Slaughter dead in his driveway. Brown found Green lying in his backyard, bleeding and grasping for air. Brown took off his shirt and applied pressure to the wound until paramedics arrived.

{¶9} Brown had an unobstructed view of Allen and Logan from his bay window and stated that he recognized Allen from the neighborhood, but did not know his name. Because of a basic distrust for the police and not wanting to be labeled a "snitch," Brown was reluctant to cooperate with the investigation. However, Brown described Allen and Logan to his neighbors and subsequently identified both Allen and Logan from a police photo array.

{¶10} Weems testified that he and the others immediately started running once the gunfire started. Weems ran up Brown's driveway, where he saw Slaughter, who had fallen to the ground. Weems, while trying to help Slaughter, could still hear gunfire and could see the sparks from the gunshots. Weems turned around and saw the faces of the assailants. Weems escaped through a neighbor's backyard, but sustained a gunshot wound to his foot.

**{¶11}** Weems recognized both assailants because he had gone to high school with Logan and knew the mother of Allen's child, but did not remember their names. Weems testified that Allen was the shooter. Weems, like Brown, initially did not cooperate with the police investigation, hinting that he had contemplated taking matters into his own hands. However, Weems eventually gave a statement to the police and subsequently identified both men from a photo array.

**{¶12}** Sisson testified that on the night of the shooting, he initially heard three gunshots, followed by rapid fire from an automatic weapon, and then everyone who had assembled began to disperse. Sisson stated that a light-complexioned black male, armed with a gun, approached, and continued to shoot. Sisson, who testified that he did not get a good look at the assailant, fled in the direction of East 123rd Street. As Sisson ran, he could feel the heat from the bullets passing him and felt certain that he would be killed. Sisson was grazed on his foot by a bullet, and was treated and released from the hospital.

**{¶13}** Tyson testified that he escaped the onslaught unharmed by fleeing and hiding in a neighbor's garage until the shooting ended. When Tyson exited the garage, he discovered Slaughter's dead body in Brown's driveway and found Green, who later died, lying in the backyard.

**{¶14}** Detectives Wally Everett and Michael Smith of the Cleveland Police Department's Homicide Unit testified they interviewed several individuals following the

shooting.   Detectives Everett and Smith confirmed that both Brown and Weems were very reluctant to cooperate with the investigation, but  eventually did, and subsequently on separate occasions identified Allen and Logan from photo arrays.

{¶15}   Allen's younger brother, Deandre Allen, testified for the defense. Deandre testified that earlier that evening, Allen and Logan took him and his friend Dapolo Green to a shoe store near the Lee-Harvard Shopping Center.  Deandre stated that Allen and Logan dropped them off at home, left together, and never returned that night.

{¶16}   Allen and Logan took the stand in their own defense.  Both men testified to being lifelong friends.  Both men testified that in the early evening of July 17, 2010, they took Allen's younger brother and his friend to a shoe store near the Lee-Harvard Shopping Center.  Allen and Logan testified that they took his younger brother and his friend back to the house and then went to sell drugs.  Logan confirmed that he went to high school with Weems and added that they played middle league football when they were younger.   Both Allen and Logan maintain they had nothing to do with the shooting.

{¶17}   On rebuttal, the state presented the testimony of Dapolo Green, who testified that the day before the shooting, Deandre indicated that Allen and Logan were going to "shoot up the block" the following day.  Green testified that he did not believe Deandre.  Green confirmed that Allen and Logan had driven him and Deandre to the

shoe store, that they were dropped off at Allen's home, that Allen and Logan left together, and that they did not return that night.

{¶18} The jury found Allen guilty of all charges and the specifications attached. The trial court sentenced Allen to an aggregate prison term of 46 years to life, with the possibility of parole after 23 years.

## Sufficiency of Evidence

{¶19} For ease of discussion we begin with the second assigned error, wherein Allen argues the state failed to present sufficient evidence to support his conviction, thus, the trial court should have granted his motion for acquittal. Pursuant to Crim.R. 29(A), a court "shall order the entry of a judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses."

{¶20} An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. A reviewing court is not to assess "whether the state's evidence is to be believed, but

whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 1997-Ohio-52, 678 N.E.2d 541.

**{¶21}** In the instant case, Allen specifically claims he was misidentified, that he was elsewhere, and that he had nothing to do with the shooting.

**{¶22}** In determining the admissibility of challenged identification testimony, a reviewing court applies a two-prong test: (1) did the defendant demonstrate that the identification procedure was unduly suggestive; and, if so, (2) whether the identification, viewed under the totality of the circumstances, is reliable despite its suggestive character. *State v. Mills*, 8th Dist. No. 95837, 2011-Ohio-3837, ¶ 16, citing *State v. Harris*, 2d Dist. No. 19796, 2004-Ohio-3570, ¶ 19. "Stated differently, the issue is whether the identification, viewed under the totality of the circumstances, is reliable despite the suggestive procedure." *State v. Wills*, 120 Ohio App.3d 320, 324-325, 696 N.E.2d 1072 (8th Dist.1997).

**{¶23}** At trial, three separate witnesses, including two victims, testified about the shooting. Brown, a disinterested third party, watched through the bay window of his home as Allen carried out the attack on the group of men. Brown also remarked that he was surprised that Allen did not see him watching the onslaught. Brown, who was reluctant to cooperate with the police, testified that he knew Allen and Logan from seeing them around the neighborhood. Brown positively identified both men from a photo array. Brown testified that he had no doubt about the identity of Allen and Logan.

{¶24}  Weems, a victim of the attack, had a good look at Allen and Logan when he tried to help Slaughter, who had been shot and had fallen in the driveway.  Weems went to school with Logan, which was confirmed by Logan's testimony, and stated that he knew the mother of Allen's child.  Weems, who also was reluctant to cooperate with the police, positively identified Allen and Logan from a photo array.

{¶25}  Sisson, another victim of the attack, did not get a good look at the assailants, but stated that he was a light-complexioned black male that had the gun.  The record indicates that Sisson's description is consistent with Allen's physical appearance.

{¶26} Here, all three witnesses had the opportunity to observe the assailants at close range at the time of the attack.  These observations, coupled with Brown and Weems's prior recognition of the assailants from seeing them in and around the neighborhood, and Weems having attended school with Logan, plus his familiarity with Allen by virtue of knowing his child's mother, significantly reduces the chance of misidentification.

{¶27}  Under the totality of the circumstances, the identification was reliable.  Further, given the reliable identification and given that there is no dispute that the attack occurred, leaving two dead and two wounded, the state presented sufficient evidence to support Allen's convictions.  Consequently, the trial court properly overruled Allen's motion for acquittal.   Accordingly, we overrule the second assigned error.

**Manifest Weight of Evidence**

{¶28}   In the first assigned error, Allen argues his conviction was against the manifest weight of the evidence.

{¶29}   In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, the Ohio Supreme Court addressed the standard of review for a criminal manifest weight challenge, as follows:

> **The criminal manifest-weight-of-the-evidence standard was explained in *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. In *Thompkins*, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. *Id*. at 386, 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. *Id*. at 386–387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive—the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. *Id*. at 387, 678 N.E.2d 541. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id*. at 387, 678 N.E.2d 541, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.**

{¶30} Allen argues the state presented conflicting and inconsistent testimonies, lacking in credibility.   However, we remain mindful that the weight of the evidence and the credibility of the witnesses are matters primarily for the fact-finder to assess. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The rationale is that the trier of fact is in the best position to take into account

inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimonies are credible. *State v. Williams*, 10th Dist. No. 02AP-35, 2002-Ohio-4503.

**{¶31}** The record in this case does not support a conclusion that the jury lost its way in finding Allen guilty of the instant charges. Brown, Weems, and Sisson provided a clear and coherent description of the rampage. Both Brown and Weems recognized Allen and Logan, and although initially reluctant to assist police with the investigation, they explained their reasons for their reluctance. In short, Allen's convictions are supported by the manifest weight of the evidence. *State v. Smith*, 8th Dist. No. 95541, 2011-Ohio-3581, ¶ 53–55. Accordingly, we overrule the first assigned error.

## Sleeping Jurors

**{¶32}** In the third assigned error, Allen argues he was denied a fair trial because the trial court did not timely address the issue of sleeping jurors. Specifically, Allen maintains that certain jurors were observed sleeping throughout the trial and as early as opening statement.

**{¶33}** In *State v. Sanders*, 92 Ohio St.3d 245, 750 N.E.2d 90 (2001), the Ohio Supreme Court held that a trial court has broad discretion in handling a situation in which a juror has fallen asleep during testimony.

**{¶34}** In this case, the matter was brought to the trial court's attention, defense counsel requested, and the trial court granted an in-camera inspection of Juror Numbers

1 and 3. The in camera inspection took place prior to the deliberation. The trial court subsequently removed Juror Number 3. The trial court allowed Juror Number 1 to remain on the panel after determining that Juror Number 1 was not sleeping. The record reveals that defense counsel agreed with the trial court's determination regarding Juror Number 1.

**{¶35}** The record also reveals that defense counsel only requested an in camera inspection of Juror Numbers 1 and 3. Defense counsel could have moved the court to voir dire or replace other jurors now alleged to have been sleeping. Instead, defense counsel remained silent. Thus, any allegation of additional sleeping jurors is waived absent plain error. *State v. Brown*, 11th Dist. No. 2003-A-0092, 2005-Ohio-2879, at ¶ 80. Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978). Plain error exists only where the results of the trial would have been different without the alleged error. *State v. Green*, 90 Ohio St.3d 352, 373, 2000-Ohio-182, 738 N.E.2d 1208.

**{¶36}** Without more evidence, for example, of what other jurors were actually sleeping and for how long, we find no error. Accordingly, we overrule the third assigned error.

## Suggestion of Gang Affiliation and Prosecutor's Improper Comments

{¶37}　　In the fourth assigned error, Allen argues he was prejudiced by the prosecutor's suggestion that he was affiliated with a gang and the prosecutor's improper comments about defense counsel.

{¶38}　A trial court has broad discretion concerning the admission of evidence; in the absence of an abuse of discretion that materially prejudices a defendant, a reviewing court generally will not reverse an evidentiary ruling. *State v. Humberto*, 10th Dist. No. 10AP–527, 2011-Ohio-3080, citing　*State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001).

{¶39}　　At trial, on direct examination, Allen testified as follows:

Q.　　**Have you ever lived on Benham?**

A.　　**No.**

Q.　　**There has been a description from some of the witnesses as to Benham Boys. Have you ever heard that term?**

A.　　**Yes.**

Q.　　**What is the Benham Boys?**

A.　　**That's their little gang.**

Q.　　**Are you a member of the Benham Boys?**

A.　　**No.**

Q.　　**Have you ever been a member of Benham Boys?**

A.      **No.** Tr. 1881-1882.

**{¶40}**   On cross-examination, Allen testified as follows:

Q.      **You've never been associated with anyone in the Benham area?**

A.      **No.**

Q.      **Never been associated with gangs in the Benham area?**

A.      **No.**

Q.      **Never been associated with the Nelson Street gang?**

A.      **No.**

Q.      **Know any members of either of those gangs?**

A.      **No.** Tr. 1919.

**{¶41}**   A review of the above excerpt indicates that Allen opened the door, which elicited the testimony of potential gang affiliation.   Thus, while the state's questions may not otherwise have been admissible, because Allen first raised the issue, it became open to all relevant inquiry.   *State v. Woodard*, 11th Dist. No. 2009-A-0047, 2010-Ohio-2949.

**{¶42}**   Further, even if admission of evidence potentially linking Allen to a gang was error, such admission was not prejudicial.   As discussed previously, the state presented sufficient evidence to sustain Allen's convictions.   Brown and Weems, two pivotal witnesses, observed Allen carrying out the attack and both witnesses positively identified him as the shooter from a photo array.

**{¶43}** Given this testimony, we find that Allen has failed to demonstrate how the admission of the testimony alleging the potential of gang membership adversely affected his right to a fair trial or that his convictions constituted a manifest miscarriage of justice. As such, we find no merit in Allen's contention.

**{¶44}** Within this assigned error, Allen also argues that he was prejudiced by the prosecutor's statement, during closing argument, that defense attorneys could not be trusted because their sole job is to acquit their clients.

**{¶45}** Initially, a prosecutor is entitled to a certain degree of latitude in closing arguments. *State v. Fether*, 5th Dist. No. 2011-CA-00148, 2012-Ohio-892, citing *State v. Liberatore*, 69 Ohio St.2d 583, 589, 433 N.E.2d 561 (1982). Thus, it falls within the sound discretion of the trial court to determine the propriety of these arguments. *State v. Maurer*, 15 Ohio St.3d 239, 269, 473 N.E.2d 768 (1984). A conviction will be reversed only where it is clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would not have found the defendant guilty. *State v. Benge*, 75 Ohio St.3d 136, 141, 1996-Ohio-227, 661 N.E.2d 1019. In the instant case, during closing argument, defense counsel stated: "trust me if you're going to describe the person of the face that you know you saw, you're going to use that kind of precise language. You don't suddenly come in and use that precise language when you're testifying at trial." Tr. 2118.

**{¶46}** The prosecutor responded by stating: "* * * you can't trust her. You can't. This isn't about trusting attorneys. You definitely can't trust defense attorney because their sole job is to acquit their defendants * * *. She's up here saying trust me, and I'm telling you and the Court will tell you that you can't trust what attorneys tell you." Tr. 2208.

**{¶47}** Here, being mindful that we are reviewing a sterile transcript, without the benefit of hearing and seeing the emotions associated with the words, when spoken, the above excerpt does not establish that defense counsel was suggesting that the jury disregard the evidence presented. We conclude, "trust me" was just a matter of speaking.

**{¶48}** Likewise, though not artfully delivered, the prosecutor's statement, that you can't trust defense attorneys because their only job is to acquit defendants, was not meant to be taken literally. If it were, it would be akin to a defense counsel stating that you can't trust prosecutors because their sole job is to convict defendants. Even though this situation involved a poor choice of words, we conclude the prosecutor was attempting to emphasize that the jury must focus on the evidence presented.

**{¶49}** Furthermore, "[i]solated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Finally, the Ohio Supreme Court has overruled a prosecutorial misconduct argument because the evidence of the defendant's

guilt was overwhelming. *See State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 116, citing *State v. Rahman*, 23 Ohio St.3d 146, 154-155, 492 N.E.2d 401 (1986). As such, the prosecutor's isolated statement was not prejudicial. Accordingly, we overrule the fourth assigned error.

## Hearsay Evidence

**{¶50}** In the fifth assigned error, Allen argues the trial court allowed the state to introduce hearsay evidence.

**{¶51}** "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). Unless an exception to the hearsay rule applies, hearsay is inadmissible. Evid.R. 802.

**{¶52}** In the instant case, Allen argues that Weems was allowed to testify with hearsay evidence.

**{¶53}** At trial, Weems testified that he recognized both Allen and Logan at the time of the shooting. As previously discussed, Weems went to high school with Logan and was familiar with Allen because he knew his child's mother. However, Weems did not remember the assailants' names until after speaking with Christopher Perkins.

**{¶54}** Here, Weems's statement was only offered to show how he recalled the names of the assailants. As such, the statement was not hearsay and was properly admitted. Accordingly, we overrule the fifth assigned error.

## Allied Offenses

**{¶55}** In the sixth assigned error, Allen argues the trial court erred by failing to merge all of the offenses for purposes of sentencing because all of the offenses arose out of the same alleged criminal transaction, and are therefore allied offenses of similar import.

**{¶56}** A defendant may be found guilty of, and convicted of, multiple allied offenses of similar import so long as he is sentenced upon only one of them. In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, the Ohio Supreme Court recently revised its allied-offense jurisprudence. The *Johnson* court stated that "[w]hen determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *Id*. at syllabus.

**{¶57}** Under *Johnson*, "[w]e determine the General Assembly's intent by applying R.C. 2941.25, which expressly instructs courts to consider the offenses at issue in light of the defendant's conduct." *Id*. at ¶ 46. "In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other." *Id*. at ¶ 48. "If the offenses correspond to such a degree that the conduct of the defendant constituting commission of

one offense constitutes commission of the other, then the offenses are of similar import."

*Id.*

**{¶58}** "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" *Id.* at ¶ 49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, ¶ 50. "If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged." *Johnson* at ¶ 50. "Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge." *Id.* at ¶ 51.

**{¶59}** Bearing directly on the case at hand, separate convictions and sentences are permitted when a defendant's conduct results in multiple victims. *See*, *e.g.*, *State v. Skaggs*, 2d Dist. No. 10-CA-26, 2010-Ohio-5390. In the instant case, Allen's conduct was directed at five separate victims, resulting in two fatalities and two others wounded. As such, the trial court did not err when it imposed separate sentences for each offense. Accordingly, we overrule the sixth assigned error.

**{¶60}** Judgment affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

PATRICIA ANN BLACKMON, ADMINISTRATIVE JUDGE

SEAN C. GALLAGHER, J., and
MARY EILEEN KILBANE, J., CONCUR