JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} A Cuyahoga County Grand Jury charged defendant-appellant Robert Henderson with murder, with firearm specifications, in violation of R.C.2903.02, and two counts of having a weapon while under disability, in violation of R.C. 2923.13.
 {¶ 2} The matter proceeded to trial. After the jury was selected, the trial court announced that it would inform the jurors that they would decide only the murder charge, and the court would decide the other charges. The state objected to this procedure, but entered into stipulations with Henderson as to his prior convictions.
 {¶ 3} The jury subsequently found Henderson guilty of murder and the firearm specifications, and the trial court found him guilty of the two disability charges. The trial court sentenced him to a cumulative sentence of 18 years to life.
I. Jury Waiver {¶ 4} In his first assignment of error, Henderson argues that the trial court lacked jurisdiction to hear the disability charges because his jury waiver was not properly executed nor made a part of the record, and his waiver was not made in open court.
 {¶ 5} In Ohio, a defendant may waive his right to trial by jury. Crim.R. 23(A). To be valid, a waiver must meet five conditions. It must be 1) in writing, 2) signed by the defendant, 3) filed, 4) made part of the record, and 5) made in open court. State v. Lomax,114 Ohio St.3d 350, 2007-Ohio-4277, at ¶ 9. Absent strict compliance with these requirements, a trial court lacks jurisdiction to try the defendant without a *Page 4 
jury. State v. Ford, Cuyahoga App. Nos. 79441 and 79442, 2002-Ohio-1100, citing State v. Pless (1996), 74 Ohio St.3d 333, paragraph one of the syllabus.
 {¶ 6} The only indication of a jury waiver in this case is the trial court's statement that the jury would decide the murder charge, and the court would decide the remaining charges. The record is devoid of any discussion between the trial judge and Henderson about a jury waiver, no written jury waiver was filed or made part of the record, and no journal entry was made and filed on this issue. The state concedes the error, and the trial court's resulting lack of jurisdiction to decide the disability charges.
 {¶ 7} Although Henderson asks this court to vacate his convictions for having a weapon while under disability in light of this error, the proper remedy is to reverse and remand for a new trial. See, e.g.,State v. Lomax, 166 Ohio App.3d 555, 2006-Ohio-1373, at ¶ 2, affirmed114 Ohio St.3d 350, 2007-Ohio-4277; Pless, supra at 340. Accordingly, Henderson's convictions on counts two and three are reversed and remanded for a new trial.
 {¶ 8} Appellant's first assignment of error is sustained in part.
II. Jury Instruction on Reckless Homicide {¶ 9} In his second assignment of error, Henderson argues that the trial court erred in failing to instruct the jury on the lesser included offense of reckless homicide. *Page 5 
 {¶ 10} A trial court is required to instruct the jury on a lesser included offense "only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." State v. Koss (1990),49 Ohio St.3d 213, 218; State v. Thomas (1988), 40 Ohio St.3d 213, paragraph two of the syllabus. "Even where a defendant offers some evidence through his own testimony supporting a lesser included offense, he is still not entitled to an instruction on that offense if the totality of the evidence does not reasonably support an acquittal on the greater offense and a conviction on the lesser offense." State v.McCurdy, 1st Dist. No. C-020808, 2003-Ohio-5518, at ¶ 15, citing State v. Campbell (1994), 69 Ohio St.3d 38, 48. The court must view the evidence in the light most favorable to the defendant when deciding whether to instruct the jury on a lesser included offense.Campbell, supra. A trial court has discretion in determining whether the record contains sufficient evidentiary support to warrant a jury instruction on a lesser included offense; we will not reverse that determination absent an abuse of discretion. State v. Wright, 4th Dist. No. 01CA2781, 2002-Ohio-1462.
 {¶ 11} Reckless homicide differs from murder only in respect to the culpable mental state. Rather than the "purposely" mental state required to support a conviction of murder, a conviction for reckless homicide requires proof only that the accused acted "recklessly." Cf. R.C.2903.02(A) and 2903.041(A). "A person acts recklessly when, with heedless indifference to the consequences, he perversely *Page 6 
disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C).
 {¶ 12} Henderson testified at trial that he was awakened around 1 a.m. on December 4, 2005 by loud banging on his front door and arguing coming from the front porch. Because his house had been broken into earlier, Henderson grabbed his loaded shotgun and went downstairs. As he walked down the narrow hallway to the front door, he saw his brother Bobby (who lived with him) outside on the porch and heard him tell someone, "get the f — off my porch."
 {¶ 13} Henderson testified that he opened the inside door, and then the storm door, to let his brother into the house. Bobby came in, yelling and swearing, and the male, later identified as Al Lessears, tried to come in behind Bobby. An unknown woman, later identified as Shanell Cooks, was behind Lessears.
 {¶ 14} Henderson stopped Lessears at the front door and told him that he would not let him in the house. According to Henderson, Lessears kept asking Henderson to let Cooks inside so she could use the bathroom. Bobby came back to the door and told Lessears to "get the f — out of here." Henderson testified that Cooks spit and then told Lessears, "[f] — them, let's go."
 {¶ 15} According to Henderson, after he saw Cooks spit, he backed up the hallway, grabbed the shotgun and held it up in the air. He then told his brother to get Lessears, who was acting "irrational" and threatening Henderson and Bobby, out of the house. *Page 7 
 {¶ 16} Henderson's brother tried to close the inside door on Lessears and push him out, but Lessears pushed the door back and tried to come in the house. Henderson, who was standing behind his brother, again told his brother to get Lessears out, and Bobby tried to grab the door, but could not reach it because Lessears was pushing it open. Henderson testified that he was upset, because he assumed that Bobby had invited Lessears over. Henderson testified that in the midst of the "chaos," he pushed his brother into Lessears and, using his elbow, tried to push them both out. When he did so, the shotgun, which Henderson testified was already chambered, went off.
 {¶ 17} Henderson panicked. He moved Lessears' feet so he could close the door and then locked it. He hurriedly changed from his bathrobe into some clothes, and ran out the back door of his house. He went to the home of an elderly and trusted neighbor, Winston Etheridge, who described Henderson as "shaking" and "hysterical." Henderson asked to use the phone; he first called his family and then the police and told them that he had shot someone. The police arrived within a few minutes and arrested Henderson.
 {¶ 18} Cleveland police officer Rico Levert, the first officer that Henderson spoke to at Etheridge's home, testified that Henderson told him, "I didn't mean to shoot him," which Levert interpreted to mean the shooting was a mistake. Levert testified that Henderson was cooperative and appeared to be "open" with the police. *Page 8 
 {¶ 19} Henderson subsequently spoke with Cleveland police detective Ignatius Sowa at the scene. Sowa testified that Henderson acknowledged that he shot Lessears, but told him that "[i]t was an accident. He kept trying to come into my house." Sowa also acknowledged that the 911 call which Henderson made to report the shooting was consistent with Henderson's statement to him that the shooting was an accident. Sowa also confirmed that no fingerprints were found anywhere on the gun, including the trigger.
 {¶ 20} Dr. Frank Miller, Cuyahoga County Coroner, testified that Lessears was 6'2" tall and weighed 266 lbs. (Henderson is 5'11" tall.) The results of blood tests showed that on the morning of December 4, 2005, Lessears had a blood alcohol level of .23 (more than three times the legal limit). He also tested positive for marijuana and PCP. Dr. Miller testified that with a blood alcohol level of .23, Lessears would have been discoordinated and had "trouble with thought and possibly logic."
 {¶ 21} Dr. Miller testified that Lessears died of a gunshot wound to his neck. He testified further that no soot or stippling was found on Lessears' body, indicating an approximate muzzle to target distance of three to four feet and the shotgun blast traveled upward through the victim's neck, front to back.
 {¶ 22} We agree with Henderson that, in light of this evidence, the jury could reasonably conclude that Henderson acted recklessly, but not purposely, in killing Lessears. Henderson's testimony was not the only evidence of a lesser intent. The *Page 9 
evidence indicated that Lessears was highly intoxicated, which the coroner admitted could have made him belligerent and illogical. In addition, Henderson's fingerprints were not found on the gun or its trigger, and the muzzle to target distance of three to four feet and the upward direction of the blast could support Henderson's account that the shotgun went off accidentally as he was pushing his brother and Lessears out of the house. Furthermore, Officer Levert and Detective Sowa both testified that Lessears told them immediately after the shooting that it was an "accident" and a "mistake." Accordingly, the record contains testimony and physical evidence from which a jury could reasonably conclude that Henderson's behavior did not reflect a purposeful killing.
 {¶ 23} Although the prosecutor would have us find Shanell Cooks' testimony more credible,[1] and asks us to disregard Henderson's statements to Levert and Sowa as simply "self-serving," it is the jury's prerogative to decide questions of fact.
 {¶ 24} We do not disagree with the jury's conclusion that Lessears' death was not an accident; a jury might well conclude that carrying a loaded, cocked shotgun in the midst of a chaotic struggle between several persons does not result in an accidental death.[2] However, the evidence discussed above could reasonably *Page 10 
support a conclusion that Henderson perversely disregarded a known risk that his loaded, engaged shotgun would fire as he held it while attempting to push his brother and Lessears out of his house. Accordingly, in the face of evidence that would reasonably allow the jury to find that Henderson acted recklessly, but not purposely, the trial court abused its discretion in denying Henderson's requested reckless homicide instruction.
 {¶ 25} Appellant's second assignment of error is sustained.
Reversed and remanded.
It is ordered that appellant recover from appellee costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES J. SWEENEY, A.J., and ANN DYKE, J., CONCUR
[1] Cooks testified that she heard Henderson cock the gun and tell Lessears, "[i]f you set foot in this house, I got something for you."
[2] "An accidental result is one that occurs unintentionally and without any design or purpose to bring it about. An accident is a mere physical happening or event, out of the usual order of things and not reasonably anticipated or foreseen as a natural or probable result of a lawful act." 4 Ohio Jury Instructions 75, § 411.01. *Page 1